# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| DANA L. BREWER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:14cv0148 TCM |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This action under 42 U.S.C. § 405(g) for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Dana Brewer (Plaintiff) for disability insurance benefits ( DIB ) under Title II of the Social Security Act (the Act ), 42 U.S.C. § 401-433, is before the undersigned by the written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB in November 2010, alleging he had become disabled on August 2, 2006, because of chronic kidney stones, osteoporosis, degenerative joint and disc disease, and a heart attack. (R.[1] at 100-06, 127.) His application was denied initially and following a hearing held in April 2012 before Administrative Law Judge (ALJ) Bradley Hanan. (Id. at 7-20, 25-42, 49, 52-56.) The Appeals Council then denied Plaintiff's request

---

[1] References to "R." are to the administrative record filed by the Commissioner with her answer.

for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (<u>Id.</u> at 1-3.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, testified at the administrative hearing.[2]

Plaintiff, fifty years old at the time of the hearing, testified that he is ambidextrous, recently divorced, and lives with his father. (<u>Id.</u> at 30.) He received divorce papers from his second wife approximately two weeks earlier. (<u>Id.</u>) She left him five months after their December 2006 marriage. (<u>Id.</u>) He does not currently have a driver's license. (<u>Id.</u>) He has a high school diploma and received some college credit when in the Navy. (<u>Id.</u> at 30-31) He was honorably discharged after twenty years' service and is receiving a military pension. (<u>Id.</u> at 31.)

After being discharged, Plaintiff worked for three years as a military policeman. (<u>Id.</u> at 33.) Plaintiff had to quit his last job, a liquid filler operator, after having a heart attack in August 2006 because his cardiologist would not release him to return to the non-air conditioned job site. (<u>Id.</u> at 32.) He could not apply for jobs for six to nine months after the attack and was never hired again. (<u>Id.</u>)

Also preventing him from working is his inability to sit for long because of kidney stones and his fatigue and weakness. (<u>Id.</u> at 34.) He cannot walk far and cannot walk longer than thirty to forty-five minutes before having to sit for ten to fifteen minutes. (<u>Id.</u> at 34-35.) He cannot sit for longer than thirty minutes before having to stand up and move around. (<u>Id.</u>

---

[2]Brenda Young, a vocational expert, was present but did not testify.

- 2 -

at 35, 36.)  He lays down for one to four hours a day.  (<u>Id.</u> at 35.)  Asked about his kidney

stones, Plaintiff explained that he has always had them, but they are getting worse and cause

him constant pain.  (<u>Id.</u> at 35-36.)  Consequently, he has trouble with his daily activities.  (<u>Id.</u>

at 36.)  For instance, he has difficulties putting on his shoes or long pants.  (<u>Id.</u>)  When he is

bothered by the kidney stones, he cannot sit for longer than thirty to sixty minutes.  (<u>Id.</u>)

Because of his degenerative disc and joint disease, Plaintiff has back problems that

limit his mobility, bending, and lifting.  (<u>Id.</u> at 37.)  He cannot lift more than ten pounds.  (<u>Id.</u>)

He uses a cane most of the time and has been for five to six years.  (<u>Id.</u>)  The cane was not

prescribed by anyone.  (<u>Id.</u> at 40.)  Also, Plaintiff is taking medication for depression.  (<u>Id.</u>

at 37.)  Plaintiff's medications cause him to "get the shakes" usually five to seven days a

month.  (<u>Id.</u> at 38-39.)  His medications include aspirin, Lipitor (a statin to reduce levels of

"bad" cholesterol, low-density lipoprotein (LDL)), and increase levels of "good" cholesterol,

high-density lipoprotein (HDL)), metoprolol (a beta blocker), Wellbutrin (an antidepressant),

Plavix (an anti-coagulant), Niaspan (to reduce LDL and increase HDL), and Lexapro (an

antidepressant).  (<u>Id.</u> at 40.)

Plaintiff pays his first wife half his pension.  (<u>Id.</u> at 33.)

Plaintiff used to drink, but has never been told by anybody he has to stop.  (<u>Id.</u>)  He

has never used illegal drugs.  (<u>Id.</u> at 34.)

Plaintiff helps his father with chores "[a]s much as [he] can."  (<u>Id.</u> at 39.)  For instance,

he helps clear the table.  (<u>Id.</u>)  His twin brother sometimes comes over and cooks.  (<u>Id.</u>)  His

brother takes out the trash.  (<u>Id.</u>)  They use a wood stove for heat, but he has not "been able

to do a whole lot of wood cutting or splitting." (Id.)  He does not vacuum because he has difficulty bending over.  (Id. at 40.)

Remarking that the only medication listed for Plaintiff was aspirin,[3] the ALJ decided to order a psychological examination of Plaintiff.  (Id. at 40-41.)  The question of his residual functional capacity (RFC) would be addressed after the record was further developed.  (Id. at 41.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ includes forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments of his physical and mental capabilities.

When applying for DIB, Plaintiff completed a Disability Report.  (Id. at 126-36.)  He is 5 feet 5 inches tall and weighs 193 pounds.  (Id. at 127.)  Plaintiff stopped working on August 8, 2008, see note six, infra, but had to make changes in his work activity on August 2, 2006.  (Id.)

Asked to describe on a Function Report what he does during the day, Plaintiff responded that he drinks a cup of coffee, takes his morning pills, smokes outside, works on a computer, walks a little, eats, watches television, shops a little, eats, takes his night-time medications, and goes to bed.  (Id. at 138.)  Occasionally he visits with friends or goes to church.  (Id.)  One to three times a week, he attends lodge meetings.  (Id.)  He does not take

_____

[3]The Court notes that Plaintiff listed seven medications when applying for DIB, including those named in his testimony.

care of anyone else. (Id. at 139.) His impairments sometimes wake him up or prevent him from going to sleep. (Id.) He has difficulty putting on shoes and socks[4] and, sometimes, has trouble standing and bending to shave. (Id.) He shops for household goods and food one to five times a month for 20 to 105 minutes each time. (Id. at 141.) His impairments adversely affect his abilities to lift, squat, bend, stand, walk, sit, kneel, and climb stairs. (Id. at 143.) He can pay attention for as long as needed and can follow written and spoken instructions "very well." (Id.) He also handles stress and changes in routine "very well." (Id. at 144.)

Plaintiff reported on a Disability Report – Appeal form that there had been no changes, no new limitations, and no new impairments since he had filed for DIB. (Id. at 163.)

An earnings report for the years from 1978 through 2008 indicated steadily increasing annual earnings for the years 1985 to 1999, when he earned his highest amount, $26, 071,[5] followed by sporadic earnings. (Id. at 107.) For instance, in 2000 Plaintiff had annual earnings of $10,593; in 2002, he had no earnings; in 2004, he had earnings of $24,695; in 2006, earnings of $9,405; no earnings in 2007; and, in 2008, $127.[6]

The medical records before the ALJ are summarized below in chronological order, beginning with the report of Plaintiff's May 2004 initial visit to Matthew Tiefenbrunn, M.D. (Id. at 396.) Plaintiff reported that he was depressed, had problems sleeping, and had no

---

[4]It was noted by the person interviewing Plaintiff when he applied for DIB that Plaintiff wore sandals with socks.

[5]All amounts are rounded to the nearest dollar.

[6]This was one day's pay when Plaintiff attempted to return to his last employment. (Id. at 137.)

energy or appetite.  (Id.)  A relationship had recently ended.  (Id.)  He had suicidal thoughts, but no plan.  (Id.)  On examination, he had "a markedly blunted affect" and bordered on being tearful.  (Id.)  Dr. Tiefenbrunn diagnosed Plaintiff with depression, prescribed Lexapro, and directed Plaintiff to follow-up in six weeks or sooner if needed.  (Id.)

Plaintiff next saw Dr. Tiefenbrunn in September 2005, complaining of vomiting, fever, and mid-back pain.  (Id. at 396.)  A computed tomography (CT) scan of his kidney, ureter, and bladder was performed to rule out renal lithiasis (the formation or presence of stony concretions, calculi).  (Id. at 396, 408.)  The CT scan revealed that Plaintiff had a horseshoe kidney[7] and multiple bilateral intrarenal calculi.  (Id. at 408.)

In November, magnetic resonance imaging (MRI) scans of Plaintiff's spine showed moderate wedge deformities of the T11 and T12 vertebral bodies.  (Id. at 403-07.)  He was diagnosed with osteoporosis; Fosamax was recommended.  (Id. at 407.)  An electrocardiogram (ECG) was normal.  (Id. at 401.)

On August 2, 2006, Plaintiff went to the emergency room at Missouri Baptist Sullivan with complaints of chest discomfort for the past hour, was given TNKase,[8] and then transferred to Missouri Baptist Medical Center (MBMC), where Stuart T. Higano, M.D.,

---

[7]A horseshoe kidney, a congenital condition, is "the most common type of renal fusion anomaly" and "is formed by fusion across the midline of two distinct functioning kidneys, one on each side of the midline."  Yuranga Weerakkody and Frank Gaillar, Horseshoe kidney, http://radiopaedia.org/articles/horseshoe-kidney (last visited Dec. 10, 2014).  A horseshoe kidney is prone to renal calculi.  Id.

[8]TNKase, Tenecteplase, are tissue plasminogen activators used to help the patient's body dissolve unwanted blood clots and used to prevent death from an acute myocardial infarction.  See TNKase, http://www.drugs.com/search.php?searchterm=TNKase (last visited Dec. 9, 2014).

performed an urgent catheterization and drug coated stent placement in the first obtuse marginal. (Id. at 312-30.) Plaintiff's risk profile included tobacco abuse and a family history of heart disease. (Id. at 316.) He was monitored for two days, had no further chest pain, and was discharged. (Id.) He was to discontinue tobacco use and was placed on a statin, ACE inhibitor, and beta blocker. (Id. at 327-28.)

When seen by Dr. Higano on August 18, Plaintiff was described as having done "remarkably well." (Id. at 203-04, 457-59.) He had not had any post myocardial infarctions, but was "somewhat tired." (Id. at 203.) On examination, his lungs were clear to auscultation and percussion; his heart rate was regular in rate and rhythm; his extremities were not swollen. (Id.) He was not intending on going back to work and was to start attending college the next week. (Id.) He was also to begin a six-week course of cardiac rehabilitation and was to see Dr. Higano immediately thereafter. (Id.) Dr. Higano told Plaintiff not to do any heavy lifting and to try to avoid smoking. (Id. at 204.)

The following month, Plaintiff saw Dr. Tiefenbrunn for a follow-up of his myocardial infarction. (Id. at 395, 478.) He was reportedly doing well, had not had any recurrent anginal events, was "'taking it easy,'" and was not "really doing any sort of physical activity." (Id.) He had not been taking Fosamax because he did not understand its purpose, but was willing to take it when the purpose was explained. (Id.) He was not in acute distress or discomfort and had an unremarkable examination. (Id.) Fosamax was prescribed and calcium supplementation and weight-bearing exercise were recommended. (Id.) Plaintiff was

encouraged to stop smoking. (Id.) He was to return in three months or sooner if needed. (Id.)

Plaintiff informed Dr. Higano when he next saw him, in February 2007, that he had "done reasonably well." (Id. at 207-08, 453-55.) He had briefly attended college, had not completed cardiac rehabilitation, and was not on any formal exercise program. (Id. at 207.) He also had not had any recurrent chest pains, heart failure symptoms, or arrhythmic symptoms. (Id.) He was still smoking, and was told to cut back. (Id.) He questioned whether he could return to his previous work, explaining that he frequently had to lift 50 to 50 pound objects and, during the summer, worked in temperatures exceeding 95 degrees. (Id.) There were no abnormalities on examination. (Id.) Dr. Higano told Plaintiff not to "do[] excessive lifting over 50 pounds and certainly not with any type of excessive thermal exposures." (Id.) Plaintiff replied that he would look for other work. (Id.) Dr. Higano further told him that he would be on aspirin and Plavix for at least a year. (Id.) It was noted on results of lab work performed two days later, on March 1, that Plaintiff's lipid profile was "much better." (Id. at 424.) Niaspan was added to raise his HDL levels. (Id.) Plaintiff was to take "baby" aspirin one-half hour before taking the Niaspan. (Id.)

Plaintiff consulted Dr. Tiefenbrunn on March 13 for assistance in stopping smoking and about depression. (Id. at 394-95, 477-78.) His current medications included Crestor, Plavix, Metoprolol, aspirin, and Fosamax. (Id. at 394.) He had not filled a prescription given him by Dr. Higano to stop smoking. (Id.) He reported that he lacked motivation, frequently felt anxious and overwhelmed, and had difficulty sleeping. (Id.) He had moderate

anhedonia (the loss of the capacity to experience pleasure).  (Id.)  He did not have any suicidal ideation or intent.  (Id.)  His physical examination was unremarkable.  (Id.)  He was started on Lexapro in addition to the Niaspan and continued on his other medications.  (Id.)  He was to follow up in six to eight weeks.  (Id.)

Plaintiff returned on April 5, reporting that the Lexapro was helping but not as well as he would like.  (Id. at 393-94, 476-77.)  He wanted to increase the dose or add another medication.  (Id. at 393.)  He had recently married but was having difficulties with erectile dysfunction.  (Id.)  On examination, he "still [had] a somewhat flattened affect," but was appropriately conversive and made good eye contact.  (Id.)  Dr. Tiefenbrunn diagnosed Plaintiff with major depression, increased his dosage of Lexapro and added Wellbutrin, and directed him to follow-up in four to six weeks.  (Id.)

Dr. Higano telephoned Plaintiff on May 2 and told him that his stress study of May 1[9] revealed some anterobasal changes that could represent ischemia but were not in the anatomically correct position and that, regardless of his prior infarction, Plaintiff had a normal, 71 percent ejection fraction.  (Id. at 210, 452.)  Plaintiff stated that he was exercising more frequently, had not had any recurrent angina, and was planning on reducing his smoking.  (Id.)  He was to return in August. (Id.)

Plaintiff did see Dr. Tiefenbrunn in August.  (Id. at 393, 423, 476.)  His total cholesterol levels and triglycerides (TGL) had increased since March.  (Id. at 423.)  His HDL

---

[9]There is a February 1, 2007, stress study report with the results cited by Dr. Higano, but no May 1 report.  See id. at 213, 400.

levels had slightly decreased.  (Id.)  Plaintiff reported that "there [were] times when he still fe[lt] depressed," but he felt as if the Lexapro was "kick[ing] in."  (Id. at 393, 476.)  On examination, he had a "fairly flattened affect," but was well groomed and made appropriate eye contact.  (Id.)  His physical examination was unremarkable.  (Id.)  Dr. Tiefenbrunn and Plaintiff discussed whether to change his antidepressant medications; Plaintiff preferred to stay on his current regimen.  (Id.)  He was to return in four months or sooner if needed.  (Id.)

Six months later, in February 2008, Plaintiff again saw Dr. Tiefenbrunn.  (Id. at 420.) His total cholesterol and TGL had again increased, the latter having approximately doubled from the March 2007 level.  (Id. at 392, 420, 475.)  Plaintiff's Crestor dosage was increased and he was told that "[m]ore strict dietary compliance [was] needed."  (Id.)  Plaintiff was described as "doing well" overall.  (Id. at 392, 475.)  There were no side effects from his medications.  (Id.)  He was continuing to smoke.  (Id.)  Although he had reduced the amount of cigarettes he smoked and knew he needed to stop entirely, he was not certain he was ready to quit.  (Id.)  His physical examination was unremarkable.  (Id.)  His diagnoses were coronary artery disease (CAD)/history of myocardial infarction, mixed hyperlipidemia, tobacco dependence, history of vertebral compression fractures,[10] and major depression, reasonably controlled.  (Id.)  Plaintiff was continued on his current medications with the dosage of Niaspan increased.  (Id.)  He was to follow-up in six months or sooner if needed. (Id.)

---

[10]Plaintiff reported that he had fallen off a twenty-foot wall in the 1980s.

Plaintiff saw Dr. Higano on March 11 for a follow-up for his CAD and for permission to return to work.  (Id. at 205, 450-51.)  Dr. Higano noted that he had not seen Plaintiff since February 2007 and that Plaintiff had not been allowed then to return to work due to high work loads.  (Id.)  Plaintiff was still smoking, but was cutting down.  (Id.)  His lipids were under control.  (Id.)  He was walking daily for one to two hours at a time.  (Id.)  He did not have any shortness of breath, heart failure symptoms, arrhythmias, palpitations, or chest pain.  (Id.)  No abnormalities were found on examination.  (Id.)  He was to have a repeat stress test and would be released to return to work if there was no significant ischemia.  (Id.)  Plaintiff underwent the test on March 19.  (Id. at 214, 399.)

Two days later, Plaintiff saw Dr. Tiefenbrunn to request a prescription for Chantix to help him stop smoking.  (Id. at 391, 473.)

In April, Plaintiff was informed by Dr. Higano that his stress perfusion study was normal.  (Id. at 209, 449.)  He was to return in three to six months.  (Id.)

Plaintiff consulted Dr. Tiefenbrunn in August for complaints of increasing flank pain Plaintiff thought might be caused by kidney stones.  (Id. at 250-51, 389, 409-10, 417, 472.)  He was described as being in mild discomfort but not in acute distress.  (Id. at 389.)  He was referred to an urologist and was to have a CT scan of his kidney, ureter, and bladder.  (Id.)  His total cholesterol and TGL had decreased and were near the March 2007 levels.  (Id. at 417.)  Plaintiff's Crestor dosage was again increased.  (Id.)  An abdominal x-ray and the CT scan revealed renal calculi with no obstructive uropathy.  (Id. at 250-51, 409-10.)

In October, Plaintiff had a bilateral retrograde pyelography and right ureteral stent placement for a nephrolithotomy to be performed the following week. (Id. at 303-11.) Subsequently, on November 5, Plaintiff was admitted to MBMC for a right percutaneous nephrolithotomy (a surgical procedure to remove kidney stones) and right ureteroscopy, (Id. at 285-302, 368-69.) The majority of the stones were removed and he was discharged two days later. (Id. at 295-96.) Plaintiff was seen at MBMC on November 26 as an out-patient for a ureteroscopy and laser lithotripsy (a procedure that uses shock waves to break up kidney stones). (Id. at 272-80.)

On April 8, 2009, Plaintiff was seen by Dr. Tiefenbrunn for abdominal pain and swelling during the past three to four months without any changes in bowel or bladder habits. (Id. at 387-88, 470-71.) Plaintiff did not have any anginal chest pain, shortness of breath with activity, or difficulty breathing when lying down. (Id. at 37.) He was not in acute distress and had an unremarkable physical examination. (Id.) He was given refills of his medications for a year, was given a referral to Jaroslaw Michalik, M.D., and was scheduled for an echocardiogram. (Id. at 388.) The echocardiogram revealed a left ventricle that was normal in size with low normal function and an estimated ejection fraction of 56 percent. (Id. at 398.) He had mild mitral and tricuspid regurgitation. (Id.)

On April 23, Plaintiff saw Dr. Higano for a pre-operative assessment prior to undergoing hernia repair surgery by Dr. Michalik. (Id. at 212, 448.) Plaintiff reported having no cardiac symptoms and walking one and one-half miles a day. (Id.) Six days later, Plaintiff underwent a stress test with myocardial perfusion imaging. (Id. at 215, 397.) He experienced

"moderate shortness of breath," had a normal ejection fraction, mild inferior hypokinesis, and no significant ischemia.  (Id.)  The results were described as being "very excellent."  (Id.)  Dr. Higano wrote Dr. Michalik that Plaintiff was cleared for the hernia repair.  (Id. at 211.)

Plaintiff was seen by Dr. Michalik on May 14 for a laparoscopic patch repair of his incisional epigastric hernia to be performed two days later.  (Id. at 217-22.)  On examination, it was noted that he suffered from depression but was alert and oriented to time, place, and person, with a normal affect and intact memory.  (Id. at 218, 219.)  The repair went well.  (Id. at 221-22.)

A June CT scan and abdominal x-ray showed multiple renal calculi.  (Id. at 245-46.)  It was noted that the calculi had increased in size and number since the last studies.  (Id.)  There was no evidence of a hernia, but there was evidence of degenerative changes in Plaintiff's lumbar spine.  (Id.)

In July, Plaintiff was seen by Brad C. White, M.D., in a follow-up visit for kidney stones.  (Id. at 346-48.)  It was noted that Plaintiff had tolerated previous stone removal procedures without significant pain or other side effects, e.g., nausea.  (Id. at 346.)  Dr. White also noted that Plaintiff had stopped smoking in April 2008.  (Id.)  On examination, Plaintiff was alert, not in acute distress, and oriented to time, place, and person.  (Id.)  He reported having no significant flank, groin, or abdominal pain, no hematuria (blood in the urine), and no urinary frequency, urgency, obstruction, or retention.  (Id. at 346.)  Treatment options were discussed; Plaintiff elected to proceed with "observation."  (Id. at 347.)  Dr. White encouraged him to increase his fluid intake and lemonade.  (Id.)

In December, Plaintiff went to the emergency room at Missouri Baptist Hospital with complaints of abdominal pain. (<u>Id.</u> at 223-40.) A CT scan and x-rays of his abdomen revealed extensive renal calcifications, i.e., kidney stones. (<u>Id.</u> at 228-32, 235.) Plaintiff was prescribed Percocet, to be taken as needed for pain. (<u>Id.</u> at 224.)

Plaintiff saw Dr. White again in January 2010 for a follow-up visit. (<u>Id.</u> at 342-44.) He was "slightly worse, but asymptomatic." (<u>Id.</u> at 342.) Again, he had no significant flank, groin, or abdominal pain, no hematuria, and no urinary frequency, urgency, obstruction, or retention. (<u>Id.</u>) His mental status examination was as before. (<u>Id.</u> at 343.) Treatment options were discussed. (<u>Id.</u>) Plaintiff choose to proceed with a percutaneous stone removal. (<u>Id.</u>) An increase in fluid intake and lemonade was again recommended. (<u>Id.</u>)

Two months later, Plaintiff underwent a left percutaneous nephrolithotomy at MBMC and was discharged two days later. (<u>Id.</u> at 253-71, 356-67.) When seen shortly thereafter by Dr. White, Plaintiff was reportedly doing well. (<u>Id.</u> at 337-39.) Dr. White noted that Plaintiff had not had any pain associated with his kidney stones and that on examination he moved all his extremities well. (<u>Id.</u> at 337, 338.) Plaintiff again reported having no significant flank, groin, or abdominal pain, no hematuria, and no urinary frequency, urgency, obstruction, or retention. (<u>Id.</u> at 337.)

Plaintiff consulted Dr. Tiefenbrunn in May for treatment of his left lower quadrant abdominal pain that had begun three days earlier, possibly due to diverticulitis. (<u>Id.</u> at 380-86, 465-69.) His myocardial infarction was "[s]table and relatively asymptomatic"; his hypertension was stable; his depression was "[w]ell controlled." (<u>Id.</u> at 382.) He smoked a

quarter pack of cigarettes a day.  (Id. at 383.)  His physical examination was unremarkable, including no hematuria, polyuria (the excessive passage of urine), suprapubic pain, or urinary urgency and incontinence.  (Id. at 384-85.)  He walked "[w]ith a normal gait with no abnormality upon inspection of the spine."  (Id. at 385.)  His TGL and HDL levels were within the recommended ranges.  (Id. at 380.)  He was to stop taking Lexapro and start taking citalopram, an antidepressant.  (Id. at 385.)  His other medications were continued.  (Id.)  A CT scan of his abdomen and pelvis revealed mild colonic wall thickening in the sigmoid region with evidence of colonic diverticulosis but no evidence of acute diverticulitis; multiple renal calculi; mild diffuse hepatitis steatosis; and minimal aortic atherosclerosis.  (Id. at 428-29.)

Plaintiff saw Dr. White in September for complaints of bilateral flank pain for the past several weeks.  (Id. at 334-36, 353-55.)  Transaxial helical imaging revealed numerous bilateral non-obstructing intrarenal calculi.  (Id.)  The calculi had increased in size and number since the previous examination.  (Id. at 353.)  There were, however, no suspicious renal masses and Plaintiff's liver, bladder, spleen, pancreas, and prostrate and adrenal glands were all normal.  (Id.)  As before, there was also no urinary frequency, urgency, obstruction, or retention.  (Id. at 334.)

In October, Plaintiff was seen by Dr. Tiefenbrunn for constant, aching pain in the top of his right foot.  (Id. at 376-79, 432, 461-64.)  X-rays of the foot revealed no acute fractures or dislocations.  (Id. at 432.)  Indomethacine, a non-steroidal anti-inflammatory drug, was prescribed to be taken routinely for one week and as needed thereafter.  (Id. at 376.)  Plaintiff

was still smoking. (Id. at 377.) A review of his systems was negative for back pain and muscle weakness. (Id.) He was alert and oriented to time, place, person, and situation and had normal insight. (Id. at 378.) He was in no apparent distress. (Id.)

Also before the ALJ were reports of assessments of Plaintiff's functional limitations and abilities.

In April 2011, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Patricia Chaplin, a single decisiomaker.[11] (Id. at 43-48.) The primary diagnosis was coronary artery disease; the secondary diagnosis was nephrolithiasis. (Id. at 43.) Another alleged impairment was osteoporosis. (Id.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and sit, stand, or walk for approximately six hours in an eight-hour workday. (Id. at 44.) His ability to push and pull was otherwise unlimited. (Id.) He had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 45-46.)

The same month, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Marsha Toll, Ph.D. (Id. at 435-45.) Plaintiff was described as having an affective disorder, i.e., major depressive disorder, that was not severe. (Id. at 435, 438.) Specifically, this disorder did not cause any restrictions in activities of daily living, difficulties in social functioning, or difficulties in maintaining concentration,

---

[11] See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

persistence, or pace. (Id. at 443.) Nor did the disorder cause him to have repeated episodes of decompensation of extended duration. (Id.)

As directed by the ALJ, Plaintiff was evaluated by Paul W. Rexroat, Ph.D., a licensed psychologist, in May 2012. (Id. at 479-85.) Plaintiff's presenting problem was depression. (Id. at 479.) Plaintiff reported he had been taking Cymbalta for the past two weeks, was still depressed, and was more depressed since his wife had filed for divorce three weeks earlier. (Id. at 480.) On examination, Plaintiff was nicely dressed and groomed and "was not suspicious, anxious, tense, or weepy." (Id.) He had a normal affect, energy level, gait, posture, speech, and range of emotional responsiveness. (Id.) He did not have unusual mood swings and was not anxious. (Id.) He reported that he has been depressed since he was married the fist time.[12] (Id.) He has periods of at least fourteen days when he is depressed. (Id.) Also, he is easily irritated, withdrawn, lacks energy, has no interest in things, has trouble going to and staying asleep, is hopeless, and has low self-esteem. (Id.) He sometimes stays in his room. (Id.)

On examination, Plaintiff was well oriented to time, place, person, and situation. (Id. at 481.) His memory was good, whether it be his immediate, delayed, recent, or remote memory. (Id.) He was functioning in the average range of intelligence. (Id.) He could understand and remember simple instructions, sustain concentration and persistence with simple tasks, and interact socially. (Id.) He had mild limitations in his ability to adapt to his environment. (Id.) He also had mild limitations in his activities of daily living. (Id.) He had

---

[12]According to Plaintiff's DIB application, he was first married in 1981. (Id. at 100.)

few limitations in social functioning. (Id. at 481-82.) His memory functioning was in the average range. (Id. at 482.) Dr. Rexroat diagnosed Plaintiff with major depression, recurrent, moderate and rated his Global Assessment of Functioning (GAF) as 61.[13] (Id.)

In a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Rexroat reported that Plaintiff's depression did not affect his ability to understand, remember, and carry out instructions. (Id. at 483.) It did mildly affect his ability to interact appropriately with the public, supervisors, and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (Id. at 484.) No other capabilities were affected by his depression. (Id.)

The ALJ forwarded to Plaintiff's counsel a copy of Dr. Rexroat's report and informed him he could request a supplemental hearing, which would be granted unless the ALJ could render a favorable decision based on the record. (Id. at 185-87.) His counsel replied that he had no objections to the report. (Id. at 188.) A supplemental hearing was not requested. (Id.)

In August 2012, a vocational expert (VE), J. Stephen Dolan, M.A., C.R.C., answered written interrogatories submitted to him by the ALJ. (Id. at 190-93, 195-96.) He was asked to assume a hypothetical claimant who had the residual functional capacity (RFC) to perform

---

[13]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted).

light work as defined in the regulations[14] with additional restrictions of being unable to climb ladders, ropes, and scaffolds; being able to only occasionally crawl or climb ramps or stairs; and having to avoid concentrated exposure to heat, cold, and extreme vibration. (Id. at 191.) This claimant had to avoid operational control of moving machinery, working at unprotected heights, and using hazardous machinery. (Id.) He was also limited to work involving only simple, routine, and repetitive tasks and requiring only occasional decision making, changes in the work setting, and interaction with coworkers and the public. (Id.) Asked if this claimant can perform any of Plaintiff's past work, Mr. Dolan replied that he cannot because that work is not simple, routine, repetitive, and light. (Id. at 195.) Asked if this claimant can perform any unskilled jobs existing in significant numbers in the state and national economies, he replied that he can perform the jobs of housekeeping cleaner, hand packager, and mail room clerk. (Id. at 195-96.) Mr. Dolan stated that there was no conflicted between his occupational evidence and the information in the *Dictionary of Occupational Titles* and *Selected Characteristics of Occupations*. (Id. at 192, 195.)

The ALJ forwarded Mr. Dolan's responses to Plaintiff's counsel, again informing him of, among other things, the right to comment and to request a supplemental hearing. (Id. at 197-98.) No comments were made; no supplemental hearing was requested.

---

[14] "According to the regulations, 'light work' is generally characterized as (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects." **Holley v. Massanari**, 253 F.3d 1088, 1091 (8th Cir. 2001) (citing Social Security Ruling 83–10, 1983 WL 31251, at *4–5 (S.S.A. 1983))

## The ALJ's Decision

The ALJ first determined that Plaintiff last met the insured status of the Act on December 31, 2010, and has not engaged in substantial gainful activity since his alleged disability onset date of August 2, 2006, through the date last insured.[15] (Id. at 12.) He next found that, through the date last insured, Plaintiff had severe impairments of CAD, nephrolithiasis, degenerative disc disease, and major depressive disorder. (Id.) He did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id. at 12-13.) Addressing Plaintiff's depression, the ALJ found him to have mild restrictions in his activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Id. at 13.) He had not had any episodes of decompensation of extended duration. (Id.) The ALJ noted that Plaintiff's records documented a history of depression, but also documented that it was well controlled. (Id.) The ALJ also noted that Plaintiff had not alleged any difficulties paying attention or finishing tasks and that he worked on a computer, read, and watched television. (Id.)

The ALJ next determined that Plaintiff had the RFC earlier described to Mr. Dolan. (Id. at 14.) In making this determination, the ALJ assessed Plaintiff's credibility. (Id. at 14-19.) He noted the complaints of abdominal and flank pain as early as May 2004 and the

---

[15]Because Plaintiff is no longer insured for Title II disability purposes, only his medical condition before the date last insured, December 31, 2010, is considered. See **Davidson v. Astrue**, 501 F.3d 987, 989 (8th Cir. 2007).

consistently normal objective examination findings, including no abnormal gait or heart irregularities. (Id. at 15-16.) He also noted that Plaintiff continued to smoke regardless of being repeatedly advised to stop. (Id. at 15.) There was no evidence that Plaintiff was prescribed or required the use of an assistive device, including a cane. (Id. at 16.) Also, Plaintiff was frequently reported not to be in acute distress and did not exhibit significant pain behaviors or such signs as abnormal breathing. (Id.) He had never sought treatment on a regular basis through a pain clinic or work hardening program. (Id.) The ALJ noted that there was no documentation of treatment for depression between May 2004 and March 2007 and that his depression was described as well controlled in May 2010. (Id. at 17.) There was no ongoing and frequent treatment by a psychiatrist, psychologist, or counselor. (Id. at 17-18) Also, there was no documentation of any complaints of medication side effects, contrary to Plaintiff's testimony. (Id. at 18.) There was no documentation of complaints of fatigue and no relevant findings, e.g., atrophy. (Id.) Although Plaintiff described significant limitations in his activities of daily living, those allegations were not self-proving. (Id.) The ALJ did consider Plaintiff's good earnings record as a factor in favor of his credibility, but found it did not outweigh the detractors. (Id. at 19.)

The ALJ concluded that with his RFC, Plaintiff was unable to perform any past relevant work, but was able to perform jobs that existed in significant numbers, as described by the VE. (Id. at 19-20.) Plaintiff was not disabled within the meaning of the Act during the relevant period. (Id. at 20.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 423(d)(1). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. § 404.1520(a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). A "severe impairment" is "any impairment or combination of impairments

which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v.

*Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting *Pearsall*, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). The

Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

**Discussion**

Plaintiff argues that the ALJ committed reversible error when (1) failing to properly determine his RFC and to explain how the evidence supported that determination and (2) evaluating his credibility.

RFC. When applying for DIB, Plaintiff alleged he cannot work because of chronic kidney stones, osteoporosis, degenerative joint and disc disease, and a heart attack. When denying his application, the ALJ found Plaintiff had severe impairments of CAD, nephrolithiasis, degenerative disc disease, and major depressive disorder. The ALJ further found that, because of these impairments, Plaintiff has the RFC to perform light work with additional restrictions of being unable to climb ladders, ropes, and scaffold; being able to only occasionally crawl and climb ramps and stairs; having to avoid concentrated exposure to heat, cold, and extreme vibration; and having to avoid the operation of moving machinery, work at unprotected heights, and use of hazardous machinery. Plaintiff also was limited to work involving only simple, routine, and repetitive tasks and requiring only occasional decision making, changes in the work setting, and interactions with coworkers and the public. Plaintiff contends this RFC is fatally flawed because the ALJ did not elicit a medical opinion when evaluating his RFC and did not indicate how the RFC was supported by the medical evidence summarized by the ALJ.

"Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and

continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

RFC does not represent the *least* an individual can do despite his or her limitations, but the

*most*." S.S.R. 96-8p, 1996 WL 374184, *2 (S.S.A. July 2, 1996) (footnote omitted). "[S.S.R.

96-8p] cautions that a failure to make [a] function-by-function assessment [of a claimant's

RFC] could 'result in the adjudicator overlooking some of an individual's limitations or

restrictions.'" **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003) (quoting S.S.R. 96-

8p, 1996 WL 374184, *1). An ALJ does not, however, fail in his duty to assess a claimant's

RFC merely because the ALJ does not address all areas regardless of whether a limitation is

found. See **Id.** Instead, an ALJ who specifically addresses the areas in which he found a

limitation but is silent as to those areas in which no limitation is found is believed to have

implicitly found no limitation in the latter. **Id.** at 567-68. See **Renstrom v. Astrue**, 680 F.3d

1057, 1065 (8th Cir. 2012) (ALJ does not fail in duty to fully develop the record by not

providing "an in-depth analysis of each piece of record").

Citing **Nevland v. Apfel**, 204 F.3d 853 (8th Cir. 2000), and, in his reply brief,

**Willcockson v. Astrue**, 540 F.3d 878 (8th Cir. 2008), Plaintiff argues that the ALJ failed in

his duty to explain *how* his RFC determination is supported by the medical evidence. The

question in **Nevland** was how the ALJ had determined that the claimant's impairments of

dysthymia (depression) and attention deficit hyperactivity disorder prevented him from

performing his past relevant work at the Post Office but did not preclude him from other

work. The court held that the ALJ's reliance on opinions of non-treating, non-examining

physicians to determine the claimant's RFC was in error and remanded with instructions for

the ALJ to seek an opinion about the claimant's RFC either from his treating physicians or from a consulting, examining physician. 204 F.3d at 858. In **Willcockson**, the question was whether the ALJ's implicit reliance on the RFC by a nonexamining consultant was in error when there was a seventeen-month gap between the consultant's RFC and the hearing, a gap during which the claimant had received additional treatment. 540 F.3d at 880. The court noted that the reliance was but one error in the case and that remand was required because of a combination of errors, including the ALJ's omission of relevant information when evaluating the claimant's credibility. **Id.**

In the instant case, the ALJ summarized Plaintiff's testimony and the medical record in support of his RFC determination. See **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (per curiam) (noting that "the current regulations make clear that [RFC] is a determination based upon all the record evidence"). In **Pfitzner v. Apfel**, 169 F.3d 566, 568 (8th Cir. 1999), the court held that the ALJ had erred when, after recounting the medical evidence, describing the claimant's RFC only in general terms. This holding was distinguished in **Depover** when the court held that the ALJ had made explicit findings as to the claimant's RFC, e.g., the claimant could not work around moving machinery and heights. 349 F.3d at 567. Citing Depover, 349 F.3d at 567, the court in **Jones v. Astrue**, 2011 WL 4445825, *10 (E.D. Mo. Sept. 26, 2011), held that an "ALJ need not provide a narrative discussion immediately following each statement of an individual limitation in the RFC, if the court can otherwise discern the elements of the ALJ's decision-making." See also **Hilgart v. Colvin**, 2013 WL 2250877, *4 (W.D. Mo. May 22, 2013) (finding that a requirement that an

ALJ "follow each RFC limitation with a list of specific evidence on which the ALJ relied" to be inconsistent with the court's duty to base its decision on "all the relevant evidence") (internal quotations omitted).

In further support of his argument, Plaintiff argues that there are no treatment notes about his ability to sit, lift, walk, stand or perform other work-related activities and, without this, the ALJ's RFC is impermissibly based only his interpretation of Plaintiff's impairments. This argument is without merit. The treatment notes refer to Plaintiff's ability to walk for a mile or two or for an hour or two each day. He was released to return to work by Dr. Higano in April 2008. His gait was described in May 2010 as normal. His physical examinations were regularly unremarkable.

Nor does the ALJ's failure to explain the "significance" of Plaintiff's recurrent kidney stone or degenerative changes of his lumbar spine undermine his RFC determination. As noted by the Commissioner, Plaintiff's kidney stones are a consequence of his horseshoe kidney, a condition present since birth. Although Plaintiff sought treatment for the stones at least six times between August 2008 and September 2010, the treatment notes consistently refer to Plaintiff having no significant pain and no accompanying urinary problems. Indeed, in August 2008 Plaintiff was described only as being in "mild discomfort" and in January as being "slightly worse" but still asymptomatic. Twenty months before his alleged disability onset date, an MRI revealed him to have osteoporosis. Plaintiff was prescribed Fosamax, but did not take it for another twenty months. His treating physician recommended weight-bearing exercise and no physical examination revealed problems with his back or gait.

"[T]he burden of persuasion to prove disability and demonstrate RFC [is] on the claimant." **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010). For the foregoing reasons, Plaintiff has not established that the ALJ erred in assessing his RFC.

Credibility. Plaintiff next argues that the ALJ erred in not finding his subjective complaints entirely credible.

As noted above, a claimant's credibility is evaluated before his RFC is determined. **Wagner**, 499 F.3d at 851. When finding Plaintiff not fully credible, the ALJ properly considered the lack of supporting objective evidence. See **Id.** (affirming the appropriateness of such consideration); **Renstrom**, 680 F.3d at 1066 (same). See also **Forte v. Barnhart**, 377 F.3d 892, 895 (8th Cir. 2004) (holding that "an ALJ may not discount allegations of disabling pain *solely* on the lack of objective medical evidence," bu such lack "is a factor the ALJ may consider") (emphasis added). And, in the instant case, Plaintiff's testimony is not only not supported by the objective medical evidence it is inconsistent with such evidence. See **Turpin v. Colvin**, 750 F.3d 989, 994 (8th Cir. 2014) (affirming adverse credibility determination by ALJ when testimony was inconsistent with medical records). The majority of Plaintiff's medical records are for treatment of his CAD and kidney stones. After being hospitalized for two days in August 2006 after suffering a heart attack, Plaintiff saw Dr. Higano once more that month, once six months later, and three times between March 2008 and April 2009. Plaintiff was released to return to work following the February 2007 visit with restrictions accommodated by the ALJ's RFC. The last visit was for clearance for hernia surgery; the results of Plaintiff's stress test were "very excellent." The second to the last visit,

in April 2008, Dr. Higano released Plaintiff to return to work without the restrictions earlier imposed. Plaintiff sought treatment for his kidney stones more recently and frequently than for his heart condition. Even so, the treatment notes consistently record that he was not in any significant pain and did not have any accompanying urinary difficulties. Indeed, in July 2009, after discussing with Dr. White treatment options for the stones, Plaintiff elected to continue as he had been. And, although Plaintiff cited degenerative disc and joint disease as disabling conditions, he had a normal gait and, in his last medical record, that of October 2010, was found not to have any back pain.

The relevant lack of supporting evidence includes the absence of any restrictions[16] placed on Plaintiff by any of his treating physicians. See **Teague v. Astrue**, 638 F.3d 611, 615 (8th Cir. 2011); **Roberson v. Astrue**, 481 F.3d 1020, 1025 (8th Cir. 2007). To the contrary, Dr. Higano released him to return to work in April 2008 without placing any restrictions on the release and Dr. Tiefenbrunn recommended weight-bearing exercises. See **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) (finding that the lack of any physical restrictions on claimant supported ALJ's adverse credibility determination).

Another proper consideration by the ALJ was Plaintiff's failure to follow his doctor's treatment recommendations, specifically, to complete a cardiac rehabilitation program and to stop smoking.[17] See **Kisling v. Chater**, 105 F.3d 1255, 1257 (8th Cir. 1997).

---

[16]As noted, the lifting and temperature exposures placed on Plaintiff by Dr. Higano were not permanent.

[17]Dr. White reported when first seeing Plaintiff in July 2009 that he had stopped smoking in April 2008. In May 2010, however, he was still smoking.

Additionally, "[a]n ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." **Van Vickle v. Astrue**, 539 F.3d 825, 828 (8th Cir. 2008). See also **McCoy**, 648 F.3d at 614 (inconsistencies in record detract from a claimant's credibility). For instance, Plaintiff reported to Dr. Tiefenbrunn that there were no medication side effects, but he testified that his medications cause him to shake. He uses a cane, but none was prescribed. See **Kriebaum v. Astrue**, 280 Fed.App'x 555, 559 (8th Cir. 2008) (finding ALJ's adverse credibility determination based on, inter alia, claimant's use of self-prescribed cane to be "supported by good reasons"). He told Dr. Higano that he did not intend to return to work but was going to start college. See **Goff**, 421 F.3d at 793 (finding it "relevant to credibility" that a claimant is not working for reasons other than his medical condition).

Plaintiff argues that the consistency between his activities of daily living and his testimony supports his credibility. A similar argument was rejected in **Whitman v. Colvin**, 762 F.3d 701 (8th Cir. 2014). In that case, the ALJ discounted the claimant's allegations of limited daily activities on the grounds that the activities could not be objectively verified and that, even if they were as restricted as alleged, the degree of limitation could not be attributed to his medical condition. **Id.** at 705. The court deferred to the ALJ's credibility finding. **Id.** at 707-08. See also **Kamann v. Colvin**, 721 F.3d 945, 951-52 (8th Cir. 2013) (affirming ALJ's credibility finding based on discrepancies between claimant's self-reported limitations and observed capacities).

Finally, the Court notes, as did the ALJ, that a good earnings record such as Plaintiff's supports his credibility, but does not necessarily outweigh the detracting considerations. See

**Finch**, 547 F.3d at 936 (noting that an *unbroken* earnings record of thirty-eight years supported claimant's credibility but did not outweigh ALJ's decision finding other factors detracted from such).

"'If an ALJ expressly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination.'" **Juszczyk v. Astrue**, 542 F.3d 626, 632 (8th Cir. 2008); accord **Buckner v. Astrue**, 646 F.3d 549, 558 (8th Cir. 2011). Having carefully considered Plaintiff's arguments to the contrary, the Court finds that the ALJ's credibility determination is supported by good reasons and is affirmed.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010).

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  7th  day of January, 2015.